**SECULAR ORGANIZATIONS FOR SOBRIETY, INC., Plaintiff-counter-defendant-Appellant,**

v.

**John E. ULLRICH; Dolly Manzi; Rocky V. Ortega, Defendants–Appellees,**

**Hubert Michael Lenihan; Nancy Clark; SOS West, Secular Organizations for Sobriety, Inc., Defendants-counter-claimants-Appellees.**

**Secular Organizations For Sobriety, Inc., Plaintiff-counter-defendant-Appellee,**

v.

**John E. Ullrich; Dolly Manzi; Rocky V. Ortega, Defendants,**

**and**

**Hubert Michael Lenihan; Nancy Clark, Defendants-counter-claimants,**

v.

**SOS West, Secular Organizations for Sobriety, Inc., Defendant-counter-claimant-Appellant.**

Secular Organizations for Sobriety, Inc., Plaintiff-counter-defendant-Appellee,

v.

John E. Ullrich; Dolly Manzi; Rocky V. Ortega, Defendants,

Hubert Michael Lenihan; Nancy Clark, Defendants-counter-claimants,

and

SOS West, Secular Organizations for Sobriety, Inc., Defendant-counter-claimant-Appellant.

Nos. 98–15143, 98–15317, 98–15407.

United States Court of Appeals, Ninth Circuit.

Submitted Feb. 14, 2000*

Filed May 25, 2000

---

* The panel unanimously finds this case suitable for decision without oral argument. *See* Fed.

R.App. 34(a).

James L. Monroe, Canton, New York, for the plaintiff-counter-defendant-appellant-cross-appellee.

Bernard A. Burk, M. Patricia Thayer, Duane R. Valz, Howard, Rice, Nemerovski, Canady, Falk & Rabkin, San Francisco, California, for the defendant-counter-claimant-appellee-cross-appellant.

Before: FLETCHER, CANBY, and O'SCANNLAIN, Circuit Judges.

O'SCANNLAIN, Circuit Judge:

In this trademark case, we must decide whether an organization dedicated to providing a secular alternative for those seeking recovery from alcohol and drug dependency established secondary meaning in its name sufficient to exclude others from using a nearly identical mark.

I

This appeal involves a dispute between parties who assert competing claims for the exclusive right to use the names "Secular Organizations for Sobriety" and "SOS" in conjunction with alcohol and drug dependency meetings. These meetings are designed to provide a secular alternative to programs, such as Alcoholics Anonymous, that emphasize religious and spiritual means to recovery. The parties have all been involved in what they describe as a grass roots movement to develop and encourage these secular alternatives. The movement began in the 1980s, and the parties began organizing meetings on an informal and voluntary basis some time before any of them adopted a specific legal framework or asserted any formal claims of ownership. This appeal is an outgrowth of the parties' attempts to assert legal claims to the marks used in connection with the secular sobriety movement.

In the early and mid–1980s, James Christopher began advocating a secular approach to self-help groups formed to support persons with drug and alcohol problems who wished to become sober. In 1984, in an article published in the quarterly journal *Free Inquiry,* Christopher initially dubbed the movement "SSG" for "Secular Sobriety Groups." *Free Inquiry* was the publication of an organization called the Council for Democratic and Secular Humanism ("CODESH"). At the suggestion of Paul Kurtz, the editor of *Free Inquiry,* the movement later came to be called the "SOS movement" or "Secular Organizations for Sobriety." The first appearance of those terms in any document associated with CODESH occurred in the spring of 1988 with the publication of Volume 1, Number 1, of the SOS National Newsletter.

In March 1988, Janis Goodall organized the first SOS-type meeting in the San Francisco Bay Area, in El Cerrito. Goodall maintained frequent contact with and received assistance from Christopher. On May 25, 1988, the *San Francisco Chronicle* published an article about the El Cerrito meeting, referring to the terms "SOS" and "Secular Organizations for Sobriety" multiple times. Christopher was identified as the founder of this movement, but CODESH was not mentioned.

Shortly thereafter, in early 1988, the local groups that made up the SOS movement in California grew in number due in large part to the efforts of individual organizers like Goodall and Hubert Michael Lenihan. At this point in time, there was no central office or governing organization for the movement. Christopher did operate what was referred to as the "SOS National Clearinghouse" out of his apartment in Los Angeles with an answering machine and a post office box. This clearinghouse produced a newsletter, with some financial support from CODESH beginning in 1988, but Christopher repeatedly emphasized the independence of the various SOS groups. In one issue of the newsletter, he wrote:

The SOS National Clearinghouse is not a "central office" from which all edicts flow. Nor does it control the actions and operations of the local groups. The SOS Clearinghouse acts as a facilitator for the movement, addressing individual questions, preparing resource material for use on the local level, and getting the word out to the media, treatment professionals, and others concerned with recovery.

SOS Nat'l Newsletter Vol. 3, No. 2.

The SOS movement was informally structured with great autonomy of the local groups and no acknowledgments binding those groups together into a national organization. Anyone who wished to establish such a group could do so simply by placing an advertisement in a newspaper and arranging for a place to convene. By 1990, approximately twenty SOS groups operated in Northern California on a volunteer basis, drawing moral support and guidance from Christopher's books and the SOS newsletter. Christopher and CODESH encouraged such independent operations.

In the spring of 1990, area representatives from Northern California grew increasingly disaffected with Christopher and CODESH because of the pace of the movement's growth and Christopher's lack of organization. Accordingly, these representatives—including Goodall and Defendants Nancy Clark and Michael Lenihan—held meetings to discuss organizational concerns. One such meeting, in June 1990, was attended by Christopher. At that meeting, the representatives, including Goodall, expressed their dissatisfaction with Christopher and his recent acceptance of a salaried position with CODESH. Christopher did not renounce his ties to CODESH and, after the meeting, moved to Buffalo, New York, to work for CODESH. He did not communicate with the Northern California groups again until late 1992.

After Christopher's departure, the Northern California groups voted in July

1990 to proceed with regional organization in order to help the organization grow. They formally incorporated as a non-profit membership corporation, under the name of SOS–West Secular Organizations for Sobriety, Inc. ("SOS–West"), in January 1991. One month later, in February 1991, Christopher and CODESH incorporated Secular Organizations for Sobriety, Inc. ("SOS Inc.") without input from any of the local groups. SOS Inc. was controlled through a board of directors composed entirely of CODESH members, including Christopher. No Northern California SOS groups are members of SOS Inc. or CO-DESH. They have never paid dues to SOS Inc., signed any charters or agreements with SOS Inc., or voted to authorize SOS Inc. or CODESH to act on their behalf.

In October 1990, a few months before the two entities incorporated, and without the knowledge of the Northern California SOS groups, CODESH applied to the Patent and Trademark Office ("PTO") for federal registration of the term "Secular Organizations for Sobriety." When CODESH applied to register the mark, it knew that the term had been used openly and freely by many local SOS groups in Northern California since early 1988. The PTO issued the federal registration of "Secular Organizations for Sobriety" to CODESH on August 18, 1992. On August 25, 1994, CODESH assigned the mark and goodwill to SOS Inc. SOS–West obtained a California state trademark registration for "SOS West Secular Organizations for Sobriety, Inc." on March 17, 1993. SOS Inc. has recently relocated to California from New York to solicit funds and members.

On October 31, 1994, Plaintiffs–Appellants SOS Inc. sued Defendants–Appellees Hubert Michael Lenihan, Nancy Clark, John Ullrich, and SOS–West for trademark infringement and unfair competition in violation of the Lanham Act, 15 U.S.C. §§ 1114, 1125(a), and for violation of similar provisions of the California Business and Professions Code, Cal. Bus. & Prof. Code §§ 14300, 14330. SOS Inc. sought an injunction to bar SOS–West from using the marks "Secular Organizations for Sobriety," "SOS," and "SOS–West."

Lenihan, Clark, Ullrich, and SOS–West deny SOS Inc.'s claim to a valid mark and counterclaim for violations of California Business & Professions Code provisions governing unlawful use of corporate names, §§ 14415, 14402, and unfair competition, § 17200. Defendants Appellees further counterclaim for cancellation of SOS Inc.'s federal trademark registration and fraudulent trademark registration under 15 U.S.C. § 1120, and seek injunctive relief.

The United States District Court held a four-day bench trial in February 1997 and, on August 27, 1997, issued its Findings of Fact and Conclusions of Law. The court ruled against SOS Inc. on all of its claims, and granted an injunction in favor of SOS–West forbidding SOS Inc. from using the disputed marks in Northern California, but rejected SOS–West's counterclaim to cancel SOS Inc.'s federal registration. The district court entered a final judgment on February 27, 1998.

SOS Inc. filed a timely notice of appeal, and SOS–West filed a timely cross-appeal.

## II

■ SOS Inc. challenges the final judgment entered by the district court after trial. Specifically, SOS Inc. challenges two of the district court's findings of fact; we review such findings for clear error. *See, e.g., Pacific Telesis Group v. International Telesis Communications*, 994 F.2d 1364, 1367–68 (9th Cir.1993). In other words, we must accept the trial court's findings unless we are left with the definite and firm conviction that a mistake has been made. *Id.* SOS Inc. has not directly challenged the district court's conclusions of law, but to the extent that its appeal implicates legal conclusions, this court reviews them de novo. *See, e.g., Self–Realization Fellowship Church v. Ananda Church of Self–Realization*, 59 F.3d 902, 906 (9th Cir. 1995).

## III

■ In order for SOS Inc. to prevail on its trademark claim, it must demonstrate that it was the first user of the disputed marks or, in the alternative, that if SOS–West was using the marks first, it was doing so as a related entity and the benefits of any such use should therefore inure to SOS Inc. The district court found against SOS Inc. in its post-trial August 26, 1997 Findings of Fact and Conclusions of Law, determining that SOS–West established prior use. We agree.

■ It is clear that neither party had established any rights to the marks prior to early 1988. Although the phrases "Secular Organizations for Sobriety" and "SOS" may have been conceived before that time, neither term was used in commerce until early 1988. A fundamental tenet of trademark law is that use of a mark in commerce in connection with products or services creates rights under state and federal law. *See* 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 16.01 (4th ed. 1996) ("The way to obtain rights in a business symbol is to actually *use* it as a mark."). Second, the members of SOS West were the only parties in Northern California actively using the mark there as of 1988. Indeed, at that time, SOS Inc. did not even exist, and would not for another three years.

■ An identifying mark is capable of being protected under the trademark laws if it is either inherently distinctive or if it is descriptive and has acquired distinctiveness through secondary meaning. *See, e.g., Kendall–Jackson Winery, Ltd. v. E. & J. Gallo Winery,* 150 F.3d 1042, 1047 (9th Cir.1998). In this case, the terms at issue are descriptive rather than distinctive, and SOS Inc., as plaintiff, had the burden of demonstrating that it had established secondary meaning in the marks. *See Yamaha Int'l Corp. v. Hoshino Gakki Co.,* 840 F.2d 1572, 1578–80 (Fed.Cir.1988). If SOS Inc. has never used the marks in commerce, it cannot establish this requisite secondary meaning.

In fact, SOS Inc. did not use the marks at issue in commerce prior to SOS–West's use. First, CODESH—SOS Inc.'s predecessor in interest—did not present any evidence of its use of the marks between 1985 and 1990. In those years, CODESH simply provided Christopher with a modicum of financial support for his newsletter, but it did not organize any SOS meetings. The first use of these marks outside of Christopher's inaugural newsletter took place in the spring of 1988, when Janis Goodall used them to promote the initial Northern California SOS meeting in El Cerrito. Plaintiffs did not prove that Goodall was aware of this newsletter before she held her meeting.

Second, CODESH has used the terms only in its quarterly newsletter. CODESH has never held any SOS meetings in Northern California or elsewhere and therefore has not used the marks in connection with these services. The newsletter itself was published only occasionally during the two years preceding CODESH's application to register the federal trademark. This manner of use is inadequate to establish secondary meaning for the purposes of trademark protection. *See* 15 U.S.C. § 1052(f) (requiring five years of continuous and exclusive use for prima facie evidence of the development of secondary meaning); *Old Swiss House, Inc. v. Anheuser–Busch, Inc.,* 569 F.2d 1130, 1133 (C.C.P.A.1978) (noting that the publication of twelve articles in various publications is public exposure insufficient to have a significant impact on the public).

Thus, CODESH's use of the mark did not establish secondary meaning because it was not sufficiently lengthy nor was it exclusive, given the mark's use by SOS–West's predecessors. The district court was therefore correct to determine that no evidence suggests that CODESH had established any secondary meaning in the descriptions "SOS" or "Secular Organizations for Sobriety" as of 1988. None exists after that date either. Indeed, the record demonstrates that it was the predecessors

to SOS–West who had established secondary meaning in the mark in Northern California. Goodall, Lenihan, and their associates, invested serious time and effort into developing the marks from 1988 to the present. They worked ardently and without pay to build membership, acquire meeting places, create literature, and network with other groups and spend thousands of dollars in operating costs. The district court's first factual finding, attributing prior use to the SOS–West predecessors, is not erroneous at all, let alone clearly so.

### IV

SOS Inc.'s argument in the alternative is equally defective. SOS Inc. contends that the Northern California groups that eventually became SOS–West used the mark under the auspices of SOS Inc., and SOS Inc. should therefore be able to derive the benefit of that use, as it would if the groups were its subsidiaries, in its contentions of sustained ownership. Under the doctrine of "related companies," the first use of a mark by a person "controlled by the registrant or applicant for registration of the mark" shall inure to the benefit of the controlling entity. 15 U.S.C. § 1055; *see also In re Wella A.G.*, 787 F.2d 1549, 1551 (Fed.Cir.1986). The district court did not find that CODESH was related to the Northern California predecessors of SOS–West and thus concluded that this doctrine was not available to SOS Inc. We agree with the district court's conclusion.

The related companies doctrine requires a showing of a substantial relationship between appellants and appellees. *See* 15 U.S.C. § 1055. The record reveals very little relationship whatsoever and certainly none that satisfies the "related companies" doctrine. Not so long ago, SOS Inc. evidently agreed. In its initial complaint, SOS Inc. alleged that SOS–West and its predecessors were never "a licensee, branch, chapter, section, division, or subdivision of plaintiff SECULAR ORGANIZATIONS FOR SOBRIETY, INC. and there is no connection between plaintiff and the

said corporation." Complaint at 3, ¶ 8. Apparently upon further research, perhaps having discovered the related companies doctrine, SOS Inc. then filed an amended complaint alleging the precise opposite, that SOS–West "was a licensee and affiliate of plaintiff SECULAR ORGANIZATIONS FOR SOBRIETY, INC. until approximately November 1, 1992." First Amended and Supplemental Complaint at 4, ¶ 8.

Apart from this naked about-face, the record is replete with evidence that there was no control exerted by CODESH over the Northern California groups. Numerous documents circulated by plaintiffs demonstrate how loose were its connections to the meeting groups. A guidebook for SOS meeting group leaders, for instance, included the following passage:

> All statements made in this handbook are meant only as guidelines, as suggestions for your consideration. If your group is started on an autonomous basis, free from any inhibiting entanglements, it can continue to experiment, to modify, to innovate as it grows. You, its members, are free to shape your meetings to fit your needs.

SOS Guidebook at 1. Again, there were no articles or bylaws binding the local groups to any national organization, and no financial connection between the entities. SOS Inc.'s claim of an implied license is utterly devoid of merit. We reject it and uphold the district court's rulings on these trademark claims.

### V

As for SOS–West's counterclaim to cancel SOS Inc.'s federal trademark, we are unable to render a decision on this point because of the absence of an initial ruling on the matter by the district court. Having assumed that its injunction had settled the matter, the district court chose not to address the issue of a federal trademark. We agree with SOS–West's argument, however, that the resolution of the cancellation claim in its favor would have

granted it rights and remedies not otherwise provided by the claims the district court resolved.

Had SOS–West prevailed on its trademark cancellation claim, it would have enjoyed greater legal benefits than it received from the mere determination that it had established prior use. *See Weiner King, Inc. v. Wiener King Corp.*, 615 F.2d 512, 522–25 (C.C.P.A.1980). Those additional benefits do, indeed, insulate its cancellation claim from mootness. *See, e.g., Murphy v. Hunt*, 455 U.S. 478, 481, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982). Had the district court proceeded to rule upon the cancellation claim and done so in SOS–West's favor, SOS–West would consequently be able to expand its use of the marks beyond its current boundaries. *See* 4 *McCarthy* §§ 26:40, 26:53. The district court's ruling, as it now stands, allows for SOS–West to use the marks, but only in the area in which it had established prior use. SOS–West is correct, then, to argue that prevailing on a cancellation claim affords it greater benefits than on the claims on which it did succeed. Those additional benefits mean that the federal cancellation claim is not moot and that the district court should have decided the question.

Although the record contains a helpful collection of facts relevant to SOS–West's trademark cancellation claim, we are not confident that the record is fully developed on that issue. We therefore remand this claim to the district court for further appropriate proceedings and entry of judgment accordingly.

## VI

The evidence in the record persuades us that the district court did not clearly err in ruling against SOS Inc. and in favor of SOS–West on the issue of prior use. We are even more convinced that the district court ruled correctly in determining that no implied license existed between the parties. We conclude, therefore, that SOS–

West sufficiently demonstrated prior use of the marks "SOS" and "Secular Organizations for Sobriety" to establish secondary meaning in them and, accordingly, we affirm the district court. As to SOS–West's counterclaim, however, we remand the matter to the district court to permit it to make its own ruling.

AFFIRMED IN PART; REMANDED IN PART. Costs in favor of SOS–West.