**FIRST SAVINGS BANK, F.S.B., Plaintiff,**

v.

**U.S. BANCORP and U.S. Bank National Association, Defendants.**

**No. 95–4020–SAC.**

United States District Court, D. Kansas.

Aug. 25, 2000.

Elizabeth R. Herbert, Pedro L. Irigonegaray, Robert V. Eye, Irigonegaray & Assoc., Topeka, KS, Thomas H. Van Hoozer, Robert D. Hovey, John M. Collins, Hovey, Williams, Timmons & Collins, Kansas City, Mo, for plaintiff.

Arthur E. Palmer, Goodell, Stratton, Edmonds & Palmer, Topeka, KS, Peter Lancaster, Stephen R. Baird, Ronald J. Brown, Dorsey & Whitney, Minneapolis, MN, for defendants.

## MEMORANDUM AND ORDER

CROW, Senior District Judge.

This service mark case comes before the court again on a protracted and involved summary judgment proceedings. The defendants seek summary judgment on several grounds that are replete with numerous legal and factual issues. (Dk. 295). Both sides submit briefs that overlook certain important facts and that sometimes give rise to more questions than answers. Having pored over notebooks of evidence in considering the numerous issues and arguments, the court's impression is that the plaintiff's evidence appears thin particularly in those areas where the legal standards are heightened and that most of the precedent is less than favorable to the plaintiff's claims.[1] With that said, the court realizes the controlling issues are largely factual, the earlier reversal on appeal puts this case in an unusual posture, and a significant portion of the evidence provided in the summary judgment record is of a kind or nature best interpreted and evaluated at a full hearing.

## PROCEDURAL HISTORY

First Savings Bank, F.S.B. ("First Savings") sued First Bank System, Inc., now known as U.S. Bancorp and U.S. Bank National Association ("Bancorp") and its member institution, First Bank, F.S.B., for service mark infringement, unfair competition, and false designation of origin under the Lanham Act, 15 U.S.C. § 1125(a) and Kansas law. First Savings sought to enjoin the defendants from using the names and marks of "First Bank(s)," "First Bank System," or "First Bank Kansas" for the defendants' banks servicing the Kansas counties of Douglas, Riley, Geary, Pottawatomie and Marshall. The parties entered into a stipulation on February 9, 1995, that limited the defendants' use of "First Bank" and similar names in these five counties pending final judgment by the court. (Dk.10). In a subsequent scheduling order, the court adopted the parties' stipulation, consolidated the preliminary injunction hearing with the trial on the merits, and established an expedited discovery and trial schedule. The district court subsequently continued the trial and allowed the defendants to file a dispositive motion.

The defendants sought summary judgment on two alternative grounds: (1) that

---

1. In a recent service mark case involving financial institutions, the Eighth Circuit observed:

> The district court held, and FNB Sioux Falls does not dispute, that consumers tend to exercise a relatively high degree of care in selecting banking services. As a result, customers are more likely to notice what, in other contexts, may be relatively minor differences in names. We recognize that other courts have determined there to be minimal or no likelihood of confusion even where the names of financial institutions share the same dominant terms. *See First Savings Bank, F.S.B. v. First Bank System, Inc.*, 101 F.3d 645, 653 (10th Cir.1996) (no likelihood of confusion between "First-

Bank" and "First Bank System" service marks where bank logos were visually distinct); *Sun Banks of Fla., v. Sun Fed. Sav. & Loan*, 651 F.2d 311, 319 (5th Cir.1981) (no likelihood of confusion between "Sun Federal Savings" and "Sun–Banks" service marks); *First Bank v. First Bank System, Inc.*, 909 F.Supp. 657, 661 (S.D.Iowa 1995) (confusion between names "First Bank" and "First Bank Iowa" is reasonably manageable such that equities weigh against permanent injunction), *aff'd*, 84 F.3d 1040 (8th Cir.1996).

> *First Nat. Bank in Sioux Falls v. First Nat. Bank, South Dakota*, 153 F.3d 885, 889–90 (8th Cir.1998).

the defendants' 1971 federal registration of FIRST BANK SYSTEM prevented First Savings from acquiring superior rights in FIRSTBANK, and (2) that the defendants used the marks of FIRST BANK and FIRST BANK SYSTEM prior to First Savings acquiring any rights in FIRST-BANK. The district court granted summary judgment for the defendants on the first ground without considering the second ground. *First Savings Bank, F.S.B. v. First Bank System, Inc.,* 902 F.Supp. 1366 (D.Kan.1995). On appeal, the Tenth Circuit reversed the summary judgment order holding instead that the defendants' 1971 registration is not confusingly similar to the plaintiff's service mark and that the defendants, as a matter of law, cannot prevail on their constructive notice defense based upon the 1971 registration. *First Savings Bank, F.S.B. v. First Bank System, Inc.,* 101 F.3d 645, 656–57 (10th Cir. 1996). The Tenth Circuit did not consider the defendants' alternative argument for summary judgment, because the record was "not well developed on this issue" and because the district court "never reached" it. *Id.* at 657. The appellate court expressly recognized that this alternative argument remained a possible ground for summary judgment on remand. *Id.*

First Savings requested an injunction during the pendency of the appeal, and the district court denied this request. *First Savings Bank, F.S.B. v. First Bank System, Inc.,* 163 F.R.D. 612 (D.Kan.1995). On remand from appeal, the plaintiff filed a motion for leave to file a supplemental complaint that added a claim for damages resulting from the defendants' actions occurring after the filing of the original complaint. The district court sustained the magistrate judge's ruling that granted plaintiff leave to add this claim. *First Savings Bank, F.S.B. v. U.S. Bancorp.,* 184 F.R.D. 363 (D.Kan.1998). The plaintiff's claim for injunctive relief is moot, as the defendants changed the name of their Kansas branch banks to U.S. Bank in early 1998. The plaintiff's only claim for relief is damages from the filing of this action

until the harm from defendants' use of the mark, "First Bank Kansas," has ended.

The defendants now seek summary judgment (Dk.295) on three alternative grounds: (1) applying the Tenth Circuit's likelihood of confusion analysis used in *First Savings Bank, F.S.B. v. First Bank System, Inc.,* 101 F.3d 645, 656–57 (10th Cir.1996), the defendants contend there is no likelihood of confusion, as a matter of law, between the plaintiff's service mark consisting of FIRSTBANK with the "walking one logo" and the defendants' service mark of "First Bank Kansas" with the octagon logo; (2) asserting the same ground which was not addressed in its prior dispositive motion, the defendants argue they used the marks of "First Bank" and "First Bank System" prior to First Savings acquiring any rights in FIRST-BANK; and (3) narrowing its prior argument, the defendants alternatively contend their federal trademark registrations preclude the plaintiff's claims for all areas outside Riley County.

## SUMMARY JUDGMENT STANDARDS

A court grants a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure if a genuine issue of material fact does not exist and if the movant is entitled to judgment as a matter of law. The court is to determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will ... preclude summary judgment." *Id.* There are no genuine issues for trial if the record taken as a whole would not persuade a rational trier of fact to find for the non-moving party. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "[T]here are cases where the evidence is so weak that the case does not raise a

genuine issue of fact." *Burnette v. Dow Chemical Co.*, 849 F.2d 1269, 1273 (10th Cir.1988).

The initial burden is with the movant to "point to those portions of the record that demonstrate an absence of a genuine issue of material fact given the relevant substantive law." *Thomas v. Wichita Coca–Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.), *cert. denied*, 506 U.S. 1013, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992). If this burden is met, the nonmovant must "come forward with specific facts showing that there is a genuine issue for trial as to elements essential to" the nonmovant's claim or position. *Martin v. Nannie and Newborns, Inc.*, 3 F.3d 1410, 1414 (10th Cir.1993) (citations omitted). The nonmovant's burden is more than a simple showing of "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348; it requires " 'present[ing] sufficient evidence in specific, factual form for a jury to return a verdict in that party's favor.' " *Thomas v. International Business Machines*, 48 F.3d 478, 484 (10th Cir.1995) (quoting *Bacchus Industries, Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir.1991)). The court views the evidence of record and draws all reasonable inferences in the light most favorable to the nonmovant. *Id.* A party relying on only conclusory allegations cannot defeat a properly supported motion for summary judgment. *White v. York Intern. Corp.*, 45 F.3d 357, 363 (10th Cir. 1995).

More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). At the same time, a summary judgment motion does not empower a court to act as the jury and determine witness credibility, weigh the evidence, or choose between competing inferences. *Windon Third Oil and Gas v. Federal Deposit Ins.*, 805 F.2d 342, 346 (10th Cir.1986), *cert. denied*, 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987).

## STATEMENT OF UNCONTROVERTED FACTS

For purposes of this motion for summary judgment, the court considers the following stated facts to be uncontroverted.

### A. *PLAINTIFF'S SERVICE MARK*

1. The plaintiff First Savings Bank, F.S.B. ("First Savings") is a federally chartered savings bank based in Manhattan, Kansas, with branch offices in Junction City and Lawrence, Kansas. It was originally chartered in 1887 as First National Bank of Manhattan and was known in the region as "First National Bank" from 1887 to 1983.

2. In 1983, First Savings adopted a new marketing name and logo, FIRSTBANK next to a number one that appears in motion (the "walking one"). It publicized this change as "a new name, a new logo, [and] a new look." In 1986, First Savings converted to a federal savings bank, changed its charter name from First National Bank of Manhattan to its current name of First Savings Bank, F.S.B., but kept its marketing name of FIRSTBANK. In 1987, First Savings opened its branch offices in Junction City and Lawrence. First Savings learned that another Lawrence bank owned a state registration for FIRST BANK. First Savings in 1988 purchased the service mark rights of the Lawrence bank and took assignment of the state registration.

3. First Savings claims a "trade territory" consisting of five counties in Kansas: Douglas, Geary, Marshall, Pottawatomie and Riley. Since 1983, First Savings has used the following mark in its signs, advertisements, and other documents:

There is evidence that the plaintiff referred to itself in some advertising, press releases, and telephone services as also "First Savings Bank" or "First Savings."

### B. *THE DEFENDANTS' ACTIONS*

4. The defendant, U.S. Bancorp ("USB"), formerly known as First Bank System, Inc. and headquartered in Minneapolis, Minnesota, is a large interstate financial holding company that provides financial services to banks, corporations, and individuals throughout the United States.

5. In January of 1995, USB merged with Metropolitan Federal Bank ("Metropolitan"), a holding company that owned savings banks across Kansas. After the merger, each of the former Metropolitan branches that were acquired were renamed "First Bank Kansas" pursuant to a USB license of trademark rights. USB operates branch offices in Lawrence and Manhattan which are within the plaintiff's claimed trade territory.

6. From the merger in 1995 to 1998, USB used the name FIRST BANK KANSAS in its signs, advertisements, and telephone services. USB added the state modifier to distinguish itself from other banks in the area also using FIRST BANK. There is evidence that during this same period USB also used the name FIRST BANK without the state modifier in its signs, advertisements, and telephone services within the plaintiff's claimed trade territory.

### C. *THE DEFENDANT'S FEDERAL TRADEMARK REGISTRATIONS*

7. On December 26, 1989, while a 1971 service mark registration for FIRST BANK SYSTEM and design was still effective, USB was granted a registration of the block letter service mark of FIRST BANK SYSTEM.

8. On March 12, 1992, USB filed a trademark application that resulted, on June 21, 1994, in a federal trademark registration for the service mark FIRST BANKS and design, for banking and credit card services.

## I. LIKELIHOOD OF CONFUSION

### A. *Overview of Arguments*

The defendants argue the plaintiff faces the dilemma of making its FIRSTBANK service mark sufficiently distinct from USB's registered mark FIRST BANK SYSTEM so as to acquire exclusive rights but also making its same service mark sufficiently similar to FIRST BANK KANSAS so as to obtain its relief requested in this proceeding. The defendants propose the Tenth Circuit's analysis in *First Savings Bank, F.S.B. v. First Bank System, Inc.*, 101 F.3d 645, 656–57 (10th Cir.1996), after substituting the plaintiff's service mark for USB's federal registration and substituting USB's FIRST BANK KANSAS with octagon for plaintiff's service mark and design, compels as a matter of law the conclusion that there is no likelihood of confusion. In response, the plaintiff places paramount importance on what it argues to be evidence of actual confusion.

### B. *Governing Law*

▆ "Likelihood of confusion forms the gravamen for a trademark infringement action." *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1089 (10th Cir.1999) (citing 15 U.S.C. §§ 1114(1), 1125(a)). "Although 'likelihood of confusion is frequently a fairly disputed issue of fact on which reasonable minds may differ, the issue is amenable to summary judgment in appropriate cases.' " *Id.* at 1089 (quoting *Universal Money Centers, Inc. v. American Tel. & Tel. Co.*, 22 F.3d 1527, 1530 n. 2 (10th Cir.) (internal quotation marks and citation omitted), *cert.*

*denied,* 513 U.S. 1052, 115 S.Ct. 655, 130 L.Ed.2d 558 (1994)). "[C]ourts retain an important authority to monitor the outer limits of substantial similarity within which a jury is permitted to make the factual determination whether there is a likelihood of confusion as to source." *First Savings Bank,* 101 F.3d at 650 (quoting *Universal Money Centers,* 22 F.3d at 1530 n. 2 (internal quotation marks and citation omitted)). To defeat summary judgment, the plaintiff must demonstrate a genuine issue of material fact exists whether the defendants' use of its marks created a likelihood of confusion as to the source of or association between the banks' services.

■ In determining the likelihood of confusion between two marks, the court considers the following factors:

(a) the degree of similarity between the designation and the trade-mark or trade name in
 (i) appearance;
 (ii) pronunciation of the words used;
 (iii) verbal translation of the pictures or designs involved;
 (iv) suggestion;
(b) the intent of the actor in adopting the designation;
(c) the relation in use and manner of marketing between the goods or services marketed by the actor and those marketed by the other;
(d) the degree of care likely to be exercised by purchasers.

*Universal Money Centers,* 22 F.3d at 1530 (quoting *Jordache Enterprises, Inc. v. Hogg Wyld, Ltd.,* 828 F.2d 1482, 1484 (10th Cir.1987)). Other factors may include evidence of actual confusion and the strength of the marks. *Id.* These factors are not exclusive but are interrelated with no one factor being dispositive. *Id.* Some factors may carry more weight in certain contexts, as in confusion of source cases where "the similarity of the marks factor constitutes the heart of our analysis." *King of the*

*Mountain Sports,* 185 F.3d at 1090 (citation omitted).

"In evaluating the degree of similarity between the marks, we consider the marks as they are encountered by the consumer in the marketplace and examine them on three levels: sight, sound, and meaning." *Heartsprings, Inc. v. Heartspring, Inc.,* 143 F.3d 550, 554 (10th Cir.) (citation omitted), *cert. denied,* 525 U.S. 964, 119 S.Ct. 408, 142 L.Ed.2d 331 (1998). In that regard, the court "must examine them 'in the context of the marks as a whole as they are encountered by consumers in the marketplace.'" *King of the Mountain Sports,* 185 F.3d at 1090 (quoting *Beer Nuts, Inc. v. Clover Club Foods Co.,* 805 F.2d 920, 925 (10th Cir.1986)).

### C. *Discussion and Analysis*

■ The parties' dispute begins with what marks are at issue. The plaintiff asserts rights in FIRSTBANK with and without the moving one logo and contends the defendants' infringing marks are FIRST BANK and FIRST BANK KANSAS both with and without the octagon logo. In contrast, the defendants argue for summary judgment analyzing only the plaintiff's name of FIRSTBANK with logo and the defendants' name of FIRST BANK KANSAS with logo.

The court looks first to the pretrial order in deciding whether the plaintiff has properly made a claim that asserts rights in the FIRSTBANK name with and without a logo. After the parties briefed the summary judgment motion, they submitted the final pretrial order which "control[s] the subsequent course of the action." Fed.R.Civ.P. 16(e). As appearing in the plaintiff's factual contentions, the plaintiff asserts rights in "the name and mark[2] FIRSTBANK," which is the subject of the state registration, as used in connection with its community banking services offered in the Kansas counties of Douglas,

---

**2.** "A service mark is a word, name, symbol, device, or any combination thereof used 'to identify and distinguish the services of one person, including a unique service, from the services others, and to indicate the source of the services.'" 101 F.3d at 651 n. 7.

Riley, Geary, Pottawatomie and Marshall. (Dk.324, p. 3). The pretrial order does not limit the plaintiff's asserted rights to FIRSTBANK only when used in combination with the walking one logo.[3] The record does not reflect that the defendants ever lodged an objection with the magistrate judge to this part of the proposed pretrial order and then sought review before the district court. Liberally construed, the pretrial order includes the plaintiff's assertion of rights in a mark and name FIRSTBANK with and without the walking one logo. *See Koch v. Koch Industries, Inc.*, 203 F.3d 1202, 1220–21 (10th Cir.), *petition for cert. filed*, 68 U.S.L.W. 3023 (U.S. Jul. 3, 2000) (No. 00–28).

The court next looks to the summary judgment record in deciding what marks the plaintiff prominently used in marketing and providing its banking services. The plaintiff submits a binder filled with exhibits showing the different forms and presentations of its mark. On most of its submitted advertising materials, television spots, exterior signs, brochures or pamphlets, letterhead, business cards, loan or commercial checks and other banking documents, the plaintiff used a mark that consists of the walking one logo, "First-Bank" in bolded and enlarged type, and its full name "First Savings Bank, F.S.B." underneath in smaller script. The Tenth Circuit said this same mark appeared on the plaintiff's "signs, advertisements, documents, etc." and "was the most prominent mark used by First Savings." 101 F.3d at 647–48. As for examples where it uses the name FIRSTBANK without the logo, the plaintiff includes an automated teller machine receipt, a flyer, a set of wire transfer instructions, a fortune cookie insert, and some other bank documents. The present summary judgment record fully sustains the Tenth Circuit's earlier conclusion that the name and logo "is the most prominent mark used by First Savings." 101 F.3d at 648. For purposes only of this summary judgment motion, the court concludes that what the Tenth Circuit identified as the plaintiff's mark is also the whole mark that was most prominently used by the plaintiff and most frequently encountered by consumers in the marketplace.

The court looks again to the pretrial order in deciding what is alleged as the defendants' infringing marks. The plaintiff's factual contentions include the allegation that the defendants used "the names and marks FIRST BANK(S) and FIRST BANK KANSAS" in the plaintiff's trade territory. (Dk.324, p. 4). The "[p]laintiff claims that it has suffered and will suffer compensable damages by defendants' use of the marks FIRST BANK(S) and FIRST BANK KANSAS for branch/community banking services in the plaintiff's territory." (Dk. 324, at p. 6). The court concludes that the plaintiff's claims are not limited to the defendant's FIRST BANK KANSAS with logo but include claims based on the defendant's use of that name and FIRST BANK(S) both with and without logos.

The plaintiff submits evidence that the defendants have used the mark FIRST BANK without the state modifier in identi-

---

**3.** It is somewhat troubling that the plaintiff now asserts rights to a mark entailing the name FIRSTBANK both with and without the logo when the Tenth Circuit in its decision considered the plaintiff to have asserted rights only in a mark having that name *plus* the walking one logo. The plaintiff tries to explain this away: "The decision of the Tenth Circuit compared the closest use of plaintiff to that of *defendant's expired registration*, in order to maintain an apples-to-apples comparison for the purpose of defendants' constructive notice defense." (Dk.303, p. 18). This explanation, however, finds no support in the record. The Tenth Circuit said nothing about the plaintiff asserting rights to different marks and then choosing one "closest" to the defendant's registered mark. If anything, the "closest" mark would have no distinctive logo that could be used to differentiate it from the federal registration. 101 F.3d at 653. Rather, the Tenth Circuit said "[t]his [mark] is the most prominent mark used by First Savings." 101 F.3d at 648. Presumably, the Tenth Circuit took some care in discerning the plaintiff's mark, for it observed at footnote eight "how confusion regarding the precise marks to be compared can lead to error." 101 F.3d at 651, n. 8.

fying its banking services offered within the plaintiff's claimed trade territory. The plaintiff's exhibits show the defendant to use FIRST BANK alone on receipts, checks, statements, letters to customers, brochures, and temporary exterior signs. There is evidence that the defendant's employees, as well as its customers, may have regularly shortened the defendants' name to FIRST BANK. For purposes of this motion only, the plaintiffs have created a genuine issue of material fact whether the defendants used FIRST BANK without the state modifier so as to be a mark of the defendants that consumers encountered in the marketplace.

In their motion for summary judgment, the defendants limit their similarity arguments to the plaintiff's mark of FIRST-BANK with the walking-one logo and the defendants' mark of FIRST BANK KANSAS with the octagon logo. They offer nothing in regard to their use of FIRST BANK alone. It is not the court's responsibility to fashion or to assume those arguments for purposes of evaluating the similarity of the marks. Considering that the similarity of the marks factor may constitute the heart of the likelihood of confusion analysis in this case, the court sees no reason to address the other factors. In sum, the court finds that the Tenth Circuit's decision does not compel· summary judgment for the defendants in light of the genuine issue of material fact over the marks used by the defendants and the distinct analysis that would govern any evaluation of those marks.

## II. PLAINTIFF'S SECONDARY MEANING Vs. DEFENDANTS' FIRST USE

### A. Overview of Arguments

The defendants contend the plaintiff cannot prove secondary meaning in its use of FIRSTBANK prior to the defendants' first use of FIRST BANK in the claimed trade territory. The defendant maintains the plaintiff's burden to prove secondary meaning is particularly heavy. Not only is the plaintiff's claimed mark weakly de-

scriptive, but it has been used by other banks. In addition, the plaintiff frequently uses other marks like FIRST SAVINGS or FIRST SAVINGS BANK to identify itself and its services in the marketplace. The defendants assert they used the marks of FIRST BANK SYSTEM and FIRST BANK in Kansas long before the plaintiff acquired any secondary meaning in FIRSTBANK. The defendants argue they need only make a minimal showing of use to defeat the plaintiff's claim of secondary meaning and exclusive rights. Finally, the defendants contend the plaintiff's claimed trade territory falls within the defendants' natural zone of expansion.

The plaintiff counters that it has ample facts from which a jury could conclude that secondary meaning was acquired before the defendants began using their marks in association with any community banking services or facilities. The plaintiff disputes that the defendants have come forth with evidence showing they had a local reputation for offering local banking services prior to 1995. The plaintiff maintains these questions, as well as the defendants' natural zone of expansion, are questions of fact for the jury to decide.

### B. Governing Law

■ "To establish a common law infringement claim, a Plaintiff must show: (1) that it is the owner in the relevant area of a mark that is distinctive and protectible, and (2) that the Defendant's actions cause a likelihood of confusion." *Laurel Capital Group, Inc. v. BT Financial Corp.* 45 F.Supp.2d 469, 481 (W.D.Pa.1999) (citing *Ford Motor Co. v. Summit Motor Products, Inc.,* 930 F.2d 277, 291 (3rd Cir.), *cert. denied,* 502 U.S. 939, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991)).

■■ The plaintiff asserts ownership of superior rights in FIRSTBANK through its exclusive and prior use in its claimed remote trade territory. "A fundamental tenet of trademark law is that use of a mark in commerce in connection with products or services creates rights under

state and federal law." *Secular Organizations for Sobriety, Inc. v. Ullrich,* 213 F.3d 1125, 1130 (9th Cir.2000) (citations omitted). "A party asserting trademark ownership in a trading area must show clear entitlement to protection of its trademark in a particular market." *Lucent Information Management, Inc. v. Lucent Technologies, Inc.,* 186 F.3d 311, 316 (3rd Cir.1999) (quotation omitted), *cert. denied,* —— U.S. ——, 120 S.Ct. 845, 145 L.Ed.2d 714 (2000). " 'In the ordinary case of parties competing under the same mark in the same market, it is correct to say that prior appropriation settles the question,' …, and that the trademark rights of the senior user trump those of the junior user." *Laurel Capital Group, Inc.,* 45 F.Supp.2d at 481 (quoting *ACCU Personnel Inc. v. AccuStaff, Inc.,* 846 F.Supp. 1191, 1204 n. 12 (D.Del.1994)). Users operating in geographically remote markets, however, may attain rights in their respective remote markets according to actual use. *Id.* at 481–82. "[A] senior user enters a remote market subject to the trademark rights already acquired, in good faith, by another user." *Id.* (Citing *United Drug Co. v. Theodore Rectanus Co.,* 248 U.S. 90, 39 S.Ct. 48, 63 L.Ed. 141 (1918), *Hanover Star Milling Co. v. Metcalf,* 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713 (1916)); Restatement (Third) of the Law of Unfair Competition § 19 (1995)); *see GTE Corp. v. Williams,* 904 F.2d 536, 542 (10th Cir.), *cert. denied,* 498 U.S. 998, 111 S.Ct. 557, 112 L.Ed.2d 564 (1990)). Likewise, "a federal registrant is still subject to the defense of a prior user of the mark who has established a market in specific areas." *Natural Footwear Ltd. v. Hart, Schaffner & Marx,* 760 F.2d 1383, 1395 (3rd Cir.), *cert. denied,* 474 U.S. 920, 106 S.Ct. 249, 88 L.Ed.2d 257 (1985). "The good-faith junior user in a remote area is entitled to relief if, at the critical date of its first use of the mark, the senior user's mark was unknown to customers in the area." *Laurel Capital Group, Inc.,* 45 F.Supp.2d at 481 (citing *Natural Footwear Ltd. v. Hart, Schaffner & Marx,* 760 F.2d at 1397). The plaintiff here asserts exclusive ownership rights to FIRSTBANK from its prior use in its geographically remote five-county region.

 Protection is given only to certain marks. "An identifying mark is capable of being protected under the trademark laws if it is either inherently distinctive or if it is descriptive and has acquired distinctiveness through secondary meaning." *See Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 769, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). This acquired distinctiveness required of descriptive marks is generally called "secondary meaning." *See Two Pesos,* 505 U.S. at 769, 112 S.Ct. 2753. FIRST BANK is a "weakly descriptive" mark. *First Savings Bank, F.S.B. v. First Bank System,* 101 F.3d at 655. Though only descriptive, a mark will still be protected if it has secondary meaning, that is, "if [it] … through usage has become, to the purchasing public, associated with a particular manufacturer or producer." *Educational Development Corp. v. Economy Co.,* 562 F.2d 26, 29 (10th Cir.1977).

 Secondary meaning is defined as "the consuming public's understanding that the mark, when used in context, refers not to what the descriptive word ordinarily describes, but to the particular business that the mark is meant to identify." *Perini Corp. v. Perini Const., Inc.,* 915 F.2d 121, 125 (4th Cir.1990). Put another way, "[s]econdary meaning refers to the manner in which a consumer identifies a specific business or a business's reputation by a particular trademark." *Platinum Home Mortg. Corp. v. Platinum Fin. Group,* 149 F.3d 722, 728 (7th Cir.1998) (citation omitted). "A trademark user establishes secondary meaning by showing that through long and exclusive use in the sale of the user's goods, the mark has become so associated in the public mind with such goods that the mark serves to identify the source of the goods and to distinguish them from those of others." *First Bank v. First Bank System, Inc.,* 84 F.3d 1040, 1045 (8th Cir.1996) (quotation and citation omitted); *see Educational De-*

*velopment Corp. v. Economy Co.*, 562 F.2d at 29–30 (secondary meaning limited to "that trade and to that branch of the purchasing public." (quotation omitted)). In sum, secondary meaning refers to the capacity of a mark in the relevant consumer marketplace to identify and distinguish a particular business or source.[4]

■ "Whether secondary meaning has attached to a mark is a question of fact." *Arrow Fastener Co., Inc. v. Stanley Works*, 59 F.3d 384, 393 (2nd Cir.1995) (citation omitted); *Marker Intern. v. De-Bruler*, 844 F.2d 763, 764 (10th Cir.1988). For this reason, it "generally should not be decided in summary fashion," unless the controlling facts are undisputed. *Marker Intern.*, 844 F.2d at 764.

■ The party asserting secondary meaning has the burden of proving it. *Secular Organizations for Sobriety*, 213 F.3d at 1130; *Yamaha Intern. Corp. v. Hoshino Gakki Co., Ltd.*, 840 F.2d 1572, 1578–79 (Fed.Cir.1988). Courts consider this burden to entail a high degree of proof. *See Sugar Busters LLC v. Brennan*, 177 F.3d 258, 269 (5th Cir.1999). "'As a general rule of thumb, the more descriptive the term, the greater the evidentiary burden to establish secondary meaning.'" *Commerce National Ins. Services, Inc. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 441 (3rd Cir.2000) (quoting 2 Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 15:28 (4th ed.1997)). Factors relevant in analyzing secondary meaning include: the nature, extent and expense of advertising; consumer studies on the link between the mark and source; sales volume, competitor's attempts at plagiarizing the mark, instances of actual confusion, and the length and exclusivity of the mark's use. *See Commerce National Ins. Services, Inc.*

*v. Commerce Ins. Agency, Inc.*, 214 F.3d at 438; *Thompson Medical Co. v. Pfizer, Inc.*, 753 F.2d 208, 217 (2nd Cir.1985); *Bank of Texas v. Commerce Southwest, Inc.*, 741 F.2d 785, 787 (5th Cir.1984). Because "the gravamen of the secondary meaning determination is 'the empirical question of current consumer association,'" "survey evidence is the most direct and persuasive evidence." *Sunbeam Products, Inc. v. West Bend Co.*, 123 F.3d 246, 253 (5th Cir.1997) (quoting *Taco Cabana Intern., Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1120, n. 7 (5th Cir.1991), *aff'd*, 505 U.S. 763, 770, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992)).

## C. Discussion and Analysis
### Survey Evidence

■ In its effort to prove secondary meaning with survey evidence, the plaintiff begins with the report of Joyce Jensen Matya which shows the results of a telephone survey conducted in March of 1995. As stated in her report, the survey reached only Riley County consumers. Based on that survey, Ms. Matya opines that "a significant percentage of relevant consumers in Riley County, Kansas identify the name 'FIRSTBANK' with the banks of First Savings Bank" and that FIRSTBANK "has a secondary meaning in the minds of the consuming public as indicating that the banking services offered under that name are identified with a single source, that being First Savings Bank." (P–381, ¶ 9). The survey results showed that 27% displayed an unaided awareness of FIRSTBANK and that 65% of the 27% were able to identify a First Savings location without assistance. These results translate into just 18% of the survey population in Riley County correctly identifying FIRSTBANK with the plaintiff.[5]

---

4. "[T]he essence of a protected mark is its capacity to distinguish a product and identify its source. The gravamen of trademark law is source identification." *Sunbeam Products, Inc. v. West Bend Co.*, 123 F.3d 246, 252 (5th Cir.1997), *cert. denied*, 523 U.S. 1118, 118 S.Ct. 1795, 140 L.Ed.2d 936 (1998).

5. In her deposition, Joyce Jensen Matya testified that "unaided awareness usually ties in more so to secondary meaning than does aided awareness" (Dk.311, Ex. B, p. 23). She further testified that when persons are aware of the name "and also match that to a location, that ... is secondary meaning" (Dk.311, Ex. B, p. 39).

The plaintiff also refers to the study done by the defendants' expert Ivan Ross in March of 1995. Of the Manhattan residents contacted, 39% included FirstBank as the name of a financial institution doing business in Manhattan. Only 17% of the surveyed Lawrence residents listed First-Bank as doing business in Lawrence, and First National Bank received more responses. The persons surveyed in the Ross study, however, were not asked any additional questions about the institution or its location in order to learn whether they had actually associated the name with the plaintiff.

While "knowledge of location is [not] a prerequisite to identifying a service with a name," such knowledge "is, however, helpful in determining whether an interviewee does in fact correctly associate a name with a service." *Bank of Texas v. Commerce Southwest, Inc.*, 741 F.2d at 789. "[T]here is no general agreement as to what minimal level of consumer association with a single source is required." *Ashland Oil, Inc. v. Olymco, Inc.*, 64 F.3d 662, 1995 WL 499466, at *3 (6th Cir.1995). "While a 50–percent figure is regarded as clearly sufficient to establish secondary meaning, a figure in the thirties can only be considered marginal." *Spraying Systems Co. v. Delavan, Inc.*, 975 F.2d 387, 394 (7th Cir. 1992) (citing 2 McCarthy § 32:54, at 786). At best, the plaintiff's survey evidence is marginal in proving secondary meaning in Riley County, and less than marginal as to Douglas County. The plaintiff offers no survey evidence regarding the other three counties, which plainly weighs against secondary meaning existing there. *See Platinum Home Mortg. Corp. v. Platinum Fin. Group*, 149 F.3d at 728.[6]

### Evidence of Use

The plaintiff next argues secondary meaning is acquired through its use of "First" in its name, beginning in 1887 as First National Bank in Manhattan and continuing with its adoption in September of 1983 of FIRSTBANK that remains in use to this day. The plaintiff asserts rights in Lawrence dating back to 1985 based on its acquisition of FIRST BANK from University State Bank in Lawrence on September 1, 1988. The court is unsure of a legal basis, and the plaintiff cites none, for the plaintiff to assert secondary meaning from another institution's use of the mark. The plaintiff opened branch banks in Lawrence and Junction City in 1987 and Marysville in 1988.

Because this case turns largely on the dominant term, FIRST BANK, the evidence, when construed most favorably to the plaintiff, does show the plaintiff to have used this mark continuously since September of 1983 in the Manhattan or Riley County area and since 1987 in Lawrence. Though a period of substantial length, time of use is not a determinative factor. *Platinum Home Mortg. Corp.*, 149 F.3d at 728. Indeed, the weight of this factor in proving secondary meaning is open to question considering the presence of other local banks with "First" in their name. This is particularly true in Lawrence where the survey evidence suggests a greater recognition of First National Bank. In addition, the evidence of record shows the plaintiff also used its charter names to identify itself both with and without the FIRSTBANK mark. *See First Bank v. First Bank System, Inc.*, 84 F.3d at 1045–46 (nearly fifteen years of use in conjunction with other names did not establish secondary meaning). Consequent-

6. The plaintiff represents that one of its Manhattan bank facilities is approximately five blocks from the Pottawatomie county line, that it opened a branch in Marysville (Marshall county) in 1989 and sold it in 1992 but retains a customer base there, and that Junction City (Geary County) is part of its Manhattan trade territory. These assertions, howev-

er, afford no factual basis for the court to interpret or apply this survey evidence with regard to these three counties. In 1995, 7,059 or 68% of the plaintiff's customers resided in Riley County, while 1,149 or 11% resided in Douglas County, 1,346 or 13% in Geary County, 435 or 4% in Marshall County, and 411 or 4% in Pottawatomie County.

ly, "[o]ther evidence must be considered to determine if a secondary meaning was acquired during a particular time span." *Bank of Texas v. Commerce Southwest, Inc.,* 741 F.2d at 788 (Nine years of exclusive use of "Bank of Texas" in a single county did not establish secondary meaning throughout the county).

*Evidence of Advertising and Promotion*

The plaintiff next discusses its promotion and advertisement of services under the name and mark of FIRSTBANK. It is the dominant term on exterior signs at each facility and appears on almost all documents used with customers. The plaintiff made this mark part of its local television, radio and newspaper advertising, as well as, a feature of its promotional activities, all of which have cost over $1,180,000 for the decade preceding 1995. In almost all of the exhibits of advertising and signs submitted to the court, the plaintiff refers to itself also as First Savings Bank. This factor favors the plaintiff insofar as showing its efforts to create an association between the shortened trade name of FIRSTBANK and its full official name of First Savings Bank. Though a relevant factor, the plaintiff's efforts "are not determinative of whether consumers actually identified" FIRSTBANK with the plaintiff. *First Bank v. First Bank System, Inc.,* 84 F.3d at 1045. Any further analysis of this factor is limited by the plaintiff's failure to provide any breakdown of these advertising expenditures into years, medium, and area of coverage. Nor can the court infer from this evidence as presented that the plaintiff specifically worked and expended funds for the purpose of developing a reputation or good will for this service mark. Finally, "it is not the amount of money spent on advertising that is important, but the results achieved with the money spent." *Bank of Texas,* 741 F.2d at 788.

*Evidence of Actual Confusion*

The plaintiff submits it has evidence of "overwhelming instances of actual confusion." (Dk.303, p. 1). "[I]f plaintiff didn't already have an established name recogni-tion under the mark FIRSTBANK, then the public wouldn't have come to plaintiff to deliver defendants' mail, seek to cash defendant's checks, and to make inquiries like the Simmers did about beginning to bank in Wamego since plaintiff was taking over the Metropolitan Federal branch there." (Dk.303, pp. 32–33). The plaintiff considers this evidence of confusion to be "a strong indication of secondary meaning." (Dk.303, p. 33).

"[E]vidence of actual confusion is but one factor in the secondary meaning analysis." *Commerce National Ins. Services, Inc.,* 214 F.3d at 440. "[I]solated instances of actual confusion [may] be de minimis." *Universal Money Centers v. AT & T,* 22 F.3d 1527, 1535 (10th Cir.1994) (citing and quoting 2 J. Thomas 'McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23.02[2][b], at 29 (3d ed. 1992) ("Evidence of actual confusion of a very limited scope may be dismissed as de minimis: 'Probable confusion cannot be shown by pointing out that at some place, at some time, someone made a false identification.' ")). Consumer calls or inquiries about affiliation is not evidence of any confusion that affected consumer's decisions. *First Keystone Federal Sav. Bank v. First Keystone Mortg., Inc.,* 923 F.Supp. 693 (E.D.Pa.1996) ("Indeed, Professor McCarthy contends that inquiries of affiliation, standing alone, are insufficient proof of confusion because they reveal the 'less than totally confused state of mind of the inquiring persons.' McCarthy, § 23.02[2][d] at 23–39."). "[E]vidence of actual confusion must refer to the confusion of reasonable and prudent consumers, and not confusion among sophisticated members of the mortgage service industry." *Platinum Home Mortg. Corp.,* 149 F.3d at 729; *see, e.g., Bank of Texas,* 741 F.2d at 788–89 (distinguished that evidence of confusion by bank personnel involved with wire transfers). In addition, the evidence must show the confusion resulted from confusion between the two institutions "as opposed to mere carelessness or accident." *First Keystone Bank,*

923 F.Supp. at 706 (citation omitted). Evidence of initial confusion associated with a name change "does not automatically establish" secondary meaning. *Bank of Texas,* 741 F.2d at 789.

Though much of its evidence of actual confusion are customer inquiries about affiliation between the financial institutions immediately following the defendants' name change, the plaintiff also comes forth with stronger evidence of confusion. Consumers attempted to cash checks and make deposits at the wrong bank. Consumers directly complained that the names were confusing and that this confusion was causing them difficulties. At least one consumer experienced a car dealer taking his car loan to the wrong bank for processing and handling. Some consumers went to First Bank Kansas with intentions of opening an account in First Savings Bank, and though told of their confusion they were then persuaded to stay and open their account at First Bank Kansas. Consumers had their mortgage payments delivered to the other bank. Wire transfers were misdirected, and mail delivered to the wrong bank. The court realizes this evidence is open to interpretation on numerous grounds, but the summary judgment record does not submit to such analysis or evaluation. Consequently, the court accepts the instances of actual confusion as some evidence of secondary meaning.

### Defendants' Prior Use

It is not enough that the plaintiff create a genuine issue of material fact as to the existence of secondary meaning. The plaintiff also bears the burden of proving that it acquired secondary meaning in FIRSTBANK before the defendants entered the claimed trade territory with the trade name of First Bank and used it in the same field or in a way having the potential for creating a likelihood of confusion. *DeCosta v. Viacom International, Inc.,* 981 F.2d 602, 612 (1st Cir.1992) (" 'Priority depends not upon which mark succeeds in first obtaining secondary meaning but upon whether the plaintiff can prove by a preponderance of the evidence that his mark possessed secondary meaning [and we add, that there was a potential likelihood of confusion] *at the time the defendant commenced his use of the mark.*' ") (quoting *Scott Paper Co. v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225, 1231 (3d Cir.1978)), *cert. denied,* 509 U.S. 923, 113 S.Ct. 3039, 125 L.Ed.2d 725 (1993); *see Investacorp, Inc. v. Arabian Inv. Banking Corp. (Investcorp) E.C.,* 931 F.2d 1519, 1525 (11th Cir.) (the defendant international investment firm used its mark through a subsidiary prior to the plaintiff, also a financial investment adviser, had gained secondary meaning in the mark), *cert. denied,* 502 U.S. 1005, 112 S.Ct. 639, 116 L.Ed.2d 657 (1991); *Saratoga Vichy Spring Co., Inc. v. Lehman,* 625 F.2d 1037, 1042–43 (2nd Cir.1980) (the use of "Saratoga Geyser" for bottled mineral water occurred before the plaintiff acquired secondary meaning in "Saratoga Vichy" for its bottled mineral water); *Scott Paper Co. v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225, 1231 (3d Cir.1978) (the plaintiff manufacturer of plastic and paper household products failed to establish secondary meaning for "Scott" in the household cleaner field where the defendant first used "Scott" on its furniture polish); *Speed Products Co. v. Tinnerman Products,* 179 F.2d 778, 781 (2d Cir.1949) (secondary meaning must be established before the other party "entered the field" with its mark); 2 Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* §§ 15:4, 16:34 (4th ed. 1997) ("[I]n determining priority of ownership of a mark which requires secondary meaning, prime emphasis must be focused on when, where, and how secondary meaning was in fact established in the mark."). The operation of this rule is made clear in this quote from *Scott Paper Co.:*

The district court failed to recognize the distinction between SLG's right to continue using the mark that its predecessor had adopted in 1925 and the separate right to exclude others from using it. Because SLG seeks only the former, we hold that

the proper test is whether Scott Paper had established secondary meaning in the household cleaner market before SLG began using its mark. (citations omitted). Thus, even if we were to sustain the district court's finding of secondary meaning and likelihood of confusion, relief would only be available if Scott Paper could prove that secondary meaning in "Scott" existed for household cleaners by 1925 [when the defendant's predecessor began door-to-door sales of its furniture polish under the name of "Scott's Liquid Gold."] 589 F.2d at 1231–32.

Rather than taking a date-specific position on its secondary meaning, the plaintiff's tack is to push back the defendants' first use to the actual name change of the former Metropolitan branch banks. This late date obviously gives plaintiff the best chance of proving a secondary meaning in FIRSTBANK and entitling it to exclusive rights to this mark in this field. The plaintiff asserts that prior to February 18, 1995, the defendants had not operated a physical banking facility in the claimed trade territory and had not used FIRST BANK there in connection with any community banking services. The plaintiff characterizes the defendants' use as restricted to services provided by remote banks who gained no local reputation as local providers of banking services. The plaintiff cites *GTE Corp. v. Williams*, 649 F.Supp. 164 (D.Utah 1986), *aff'd*, 904 F.2d 536 (10th Cir.1990), as an example where a national user and registrant of a mark did not gain any rights from its national advertising, customer's use of credit cards or calling cards in remote area, or its rendering of some services to persons in Utah from facilities outside Utah.[7]

The defendant argues a showing of use will defeat the plaintiff's claim of exclusive rights. Specifically, "[t]he proof of use necessary for a defendant to preserve its right to *nonexclusive* use, accordingly, is entirely different from the far greater use required by a plaintiff claiming that its market penetration is sufficient to justify *exclusive* use." (Dk.296, p. 26). To prove prior use, the defendants highlight several facts showing a business presence in Kansas. The defendants present evidence that in the 1980's they advertised the FIRST BANK SYSTEM name in national publications and in local newspapers and business journals published in Wichita and Kansas City. They also have evidence that in the 1980's they conducted some commercial lending business in Wichita and the Kansas City area through one or more of its subsidiaries (*e.g.*, FBS Mortgage office in Kansas City, Missouri and First Bank Minneapolis in Minnesota). The defendants offer evidence of home improvement lending in Kansas in the 1970's through its subsidiary FBS Financial, Inc., located in Kansas City, Missouri. Beginning in the 1970's through today, the defendants have maintained a credit card business in Kansas that included persons living in the five-county trade territory claimed by the plaintiff. The defendants also offer evidence of correspondent banking in Kansas including several individuals located in Riley and Douglas counties during 1986. The court summarizes that, presence as national advertising, commercial banking from remote sites in Kansas counties outside the five-county trade area, home improvement loans from remote sites (41 consumer loan accounts existing in trade area in 1974), credit cards issued from remote sites (38 open accounts existing in trade area as of September of 1986), and checking and savings accounts, retirement accounts and certificate of deposit accounts

---

7. As the defendants aptly point out, the Tenth Circuit later held that "[n]one of GTE's operating subsidiaries has ever done business or provided services in Utah," none has provided "services in Utah under the mark 'General Telephone,' " and none "has ever conducted advertising in Utah for specific operating subsidiaries (which use the 'General Telephone' mark), and none of the advertising of and for the specific operating subsidiaries was ever shown or run in Utah." 904 F.2d at 542. In addition, the district court framed the issue as whether GTE had acquired secondary meaning in General Telephone in Utah and not as whether GTE had simply used the mark there.

held at remote sites (over 30 such accounts existing in the trade area as of September of 1983). Finally, the defendants contend its banking activities surrounding Kansas and its commercial activities in certain Kansas counties place the claimed five-county territory within its natural zone of expansion.

These arguments turn on what constitutes the plaintiff's field and whether the defendants entered that field so as to create the potential for confusion. The court understands the plaintiff considers the field to be community banking and the services associated with it. The defendants dispute that its prior use depends on a physical facilities within the territory. They cite *Kyhos v. Perpetual Savings and Loan Ass'n.*, 480 F.2d 204, 208 (4th Cir. 1973), where the court recognized that a building and loan association could acquire secondary meaning even in those trade territories where it lacked offices because of state law:

[W]e are impressed by a certain artificiality in the assertion that Perpetual Building is not engaged in business in Virginia. Although Perpetual Building was neither "doing business" nor was it authorized to "do business" in Virginia in accordance with the Virginia statutes, the fact is that, lawfully, it had a substantial number of customers in Virginia, and particularly in Prince William County, and had made a number of loans secured by the pledge of real estate in those jurisdictions. We do not think that in the context of an alleged misappropriation of a trade name, we ought to be blinded to realities by the technical niceties of Virginia's concept of a building and loan association's "doing business." The business of a building and loan association is to receive deposits and make loans.... That Perpetual Building was not permitted to establish an office in Prince William County or elsewhere in Virginia might limit the extent of its business, but, with the availability of present day communications and travel, it can hardly be said to have eliminated it. 480 F.2d 204, 208 (4th Cir.1973).

The court believes there are questions of material fact regarding whether the defendants' prior uses constitute entering the same field as the plaintiff so as to create the potential for confusion. The first question is whether the marketplace even recognizes community banking as a field distinct from typical banking services. Assuming it does, the next question is what kind of services are primarily associated with community banking and whether physical presence, if any, is necessary to or important in providing them. There also is an issue whether the defendants' prior uses are so closely related to the services provided in the community banking field as to create the potential for confusion. The summary judgment record does not establish the uncontroverted facts needed to make these determinations.

On the evidence before it and the analysis offered it, the court believes the issue of secondary meaning is not now susceptible to summary judgment. Though the case law suggests courts have been more aggressive in deciding secondary meaning at summary judgment, the court is not satisfied that this record is as complete and the analysis as focused as what other courts have been presented with in deciding these issues. Due to the state of the record, the court is unable to rule out the plaintiff's ability to prove its secondary meaning was acquired in the claimed trade territory prior to the defendants' use of FIRST BANK within the same field. Nor does the record establish that community banking in Kansas was a natural zone of expansion for the defendants considering they had been able to provide certain banking services in Kansas through its remote sites.

## III. PLAINTIFF'S SECONDARY MEANING Vs. DEFENDANTS' FEDERAL REGISTRATIONS

### A. *Overview of Arguments*

The defendants contend that the plaintiffs cannot prevail over the defendants' rights under their federal registrations of

1989 and 1992, unless the plaintiff proves secondary meaning prior to the filing dates of those registrations. The burden to prove secondary meaning is triggered, according to the defendants, because they are not seeking exclusive rights to FIRST BANK. "Because plaintiff cannot establish common law trademark rights, including secondary meaning, anywhere outside Manhattan before March 1992, summary judgment establishing USB's right to at least *nonexclusive* use of its marks is appropriate." (Dk.296, p. 31).

In response, the plaintiff contends this issue can be rejected promptly for several reasons. First, the defendants have not followed through in proving their constructive notice defense, specifically likelihood of confusion, as discussed and analyzed in *First Savings Bank*, 101 F.3d at 652. Second, the plaintiff qualifies for the prior user exception to the constructive notice provision of 15 U.S.C. § 1057(c)(1). Lastly, the Tenth Circuit has rejected the defendant's constructive notice defense, "[i]f we were to hold otherwise, we would in effect give First Bank System potentially nationwide rights, dating back to 1971, in FIRST BANK per se, even though these words alone almost certainly could not be registered." 101 F.3d at 656.

B. *Discussion and Analysis*

 Having failed to follow through with the constructive notice analysis outlined in the Tenth Circuit's prior decision, the defendants are simply not entitled to summary judgment on this issue. For purposes of trial, the court directs the parties' attention to the Third Circuit's following interpretation of the prior user exception to 15 U.S.C. § 1057(c):

It is a well-settled principle that a plaintiff must establish that it had prior rights or "priority" in the mark. *See Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1231 (3d Cir.1978) ("relief is only available if the plaintiff establishes priority"). Because LTI filed its ITU on November 30, 1995, LTI has priority over anyone using mark after that date unless the person earlier used the mark. 15

U.S.C. §§ 1051(b). 1057(c). Accordingly, inasmuch as LIM does not assert prior registration, *see Zazu Designs v. L'Oreal, S.A.*, 979 F.2d 499, 503 (7th Cir.1992), it can prevail only if it shows prior use of the mark "in a sufficiently public to identify or distinguish the marked goods in appropriate segment of the public mind as those of the adopter of the mark." *Blue Bell, Inc. v. Farah Mfg. Co., Inc.*, 508 F.2d 1260, 1266 (5th Cir.1975).

*Lucent Information Management, Inc. v. Lucent Technologies, Inc.*, 186 F.3d at 315. The defendants have not carried their initial burden of showing the absence of material facts in applying this definition of prior "use."

### PLAINTIFF'S MOTION TO STRIKE DEFENDANTS' EXHIBITS

The plaintiff moves to strike several exhibits and the affidavit of James P. Knutson submitted by the defendants in support of their motion for summary judgment. (Dk.307). Because the court intends to deny the defendants' motion for the reasons stated above, the plaintiff has not been prejudiced by these exhibits and affidavit. The court denies the plaintiff's motion as moot.

IT IS THEREFORE ORDERED that the defendants' motion for summary judgment (Dk.295) is denied;

IT IS FURTHER ORDERED that the plaintiff's motion to strike (Dk.307) several exhibits and the affidavit of James P. Knutson submitted by the defendants in support of their motion for summary judgment is denied.